SYKES, Circuit Judge.
These consolidated appeals challenge the federal government’s “contraception *659 mandate,” a regulatory requirement imposed by the Department of Health and Human Services (“HHS”) to implement the terms of the 2010 Patient Protection and Affordable Care Act. The mandate requires employers to provide coverage for contraception and sterilization procedures in their employee health-care plans on a no-cost-sharing basis. Noncompliance carries heavy financial penalties and the risk of enforcement actions.
The plaintiffs are two Catholic families and their closely held corporations — one a construction company in Illinois and the other a manufacturing firm in Indiana.' The businesses are secular and for profit, but they operate in conformity with the faith commitments of the families that own and manage them. The plaintiffs object for religious reasons to providing the mandated coverage. They sued for an exemption on constitutional and statutory grounds.
Center stage at this juncture is the Religious Freedom Restoration Act of 1993 (“RFRA”), 42 U.S.C. §§ 2000bb et seq., which prohibits the federal government from placing substantial burdens on “a person’s exercise of religion,” id. § 2000bb-1(a), unless it can demonstrate that applying the burden is the “least restrictive means of furthering ... [a] compelling governmental interest,” id. § 2000bb-l(b). Focusing primarily oh their RFRA claims, the plaintiffs in each case moved for a preliminary injunction. The district judges denied relief, holding that the claims were not likely to succeed. We provisionally disagreed and enjoined enforcement of the mandate pending appeal.
The appeals have now been briefed and argued and are ready for decision. Plenary review has confirmed our earlier judgment. These cases — two among many currently pending in courts around the country — raise important questions about whether business owners and their closely held corporations may assert a religious objection to the contraception mandate and whether forcing them to provide this coverage substantially burdens their religious-exercise rights. We hold that the plaintiffs — the business owners and their companies — may challenge the mandate. We further hold that compelling them to cover these services substantially burdens their religious-exercise rights. Under RFRA the government must justify the burden under the standard of strict scrutiny. So far it has not done so, and we doubt that it can. Because the RFRA claims are very likely to succeed and the balance of harms favors protecting the religious-liberty rights of the plaintiffs, we reverse and remand with instructions to enter preliminary injunctions barring enforcement of the mandate against them.
I. Background
A. The Contraception Mandate
On March 23, 2010, Congress adopted the Affordable Cafe Act, a sweeping legislative and regulatory overhaul of the nation’s health-care system. The Act “aims to increase the number of Americans covered by health insurance and decrease the cost of health care.” Nat’l Fed’n of Indep. Bus. v. Sebelius (“NFIB”), - U.S.-, 132 S.Ct. 2566, 2580, 183 L.Ed.2d 450 (2012). One feature of the Act is a requirement that employee health-care plans governed by ERISA[1] provide certain minimum levels of coverage to plan participants and beneficiaries. See 29 U.S.C. § 1185d (applying the requirements of part A of Title XXVII of the Public Health Services Act as amended by the Affordable *660 Care Act to ERISA-governed group health plans). More specifically, the Affordable Care Act establishes a general requirement that employer-sponsored group health-care plans cover “preventive care and screenings” for women on a no-cost-sharing basis; Congress instructed HHS to fill in the details:
A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for—
(4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [“HRSA,” an agency within HHS] for purposes of this paragraph.
42 U.S.C. § 300gg-13(a); see also 29 U.S.C. § 1185d.
Before promulgating regulations pursuant to this statutory directive, the HRSA sought advice from the Institute of Medicine at the National Academy of Science about what services to include in the preventive-care mandate. Based on the Institute’s recommendations, the HRSA issued comprehensive guidelines requiring coverage of (among other things) “[a]ll Food and Drug Administration [“FDA”] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity.” Health Res. & Servs. Admin., Women’s Preventive Services Guidelines: Affordable Care Act Expands Prevention Coverage for Women’s Health and Well-Being, http://www.hrsa.gov/womens guidelines/ (last visited Nov. 7, 2013). These include oral contraceptives (“the pill”), barrier methods, implants and injections, emergency oral contraceptives (“Plan B” and “Ella”), and intrauterine devices.[2] On February 15, 2012, HHS published final regulations incorporating the HRSA guidelines. See Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services, 77 Fed.Reg. 8725 (Feb. 15, 2012). The agency made the mandate effective in the first plan year on or after August 1, 2012.[3] See 45 C.F.R. § 147.130(b)(1).
Noncompliance with the contraception mandate is punished by steep financial penalties and other civil remedies. For example, failure to provide the mandated coverage brings a tax penalty of $100 per day per employee — $36,500 per year per employee. See 26 U.S.C. § 4980D(a), (b)(1). If an employer discontinues offering a health plan altogether, the penalty is $2,000 per year per employee. See id. § 4980H(a), (c). In addition, noncomplying employers face potential enforcement actions by the Secretary of Labor and plan participants and beneficiaries under ERISA. See 29 U.S.C. §§ 1132, 1185d.
Like many of the other employer mandates in the Affordable Care Act, the con *661 traception mandate applies to employers with 50 or more full-time employees. See 26 U.S.C. § 4980H. Smaller employers— those with fewer than 50 full-time employees — are not required to provide a health plan for their employees and apparently are not subject to the coverage mínimums, including the contraception mandate. See id. We say “apparently” because it’s not entirely clear that the mandate is categorically inapplicable to small employers; the government takes the position that if a small employer not otherwise required to provide an employee health-care plan nonetheless chooses to do so, the regulatory scheme requires inclusion of the mandated contraception coverage.
Health plans in existence when the Act was adopted are “grandfathered” and do not need to comply with the coverage minimums — including the contraception mandate — unless the plan sponsor makes certain changes to the terms of the plan. See 42 U.S.C. § 18011. Grandfathering is a transitional measure; this category will shrink as employer-based plans existing prior to March 23, 2010, undergo changes. The government estimates that the number of plans in grandfathered status will dwindle fairly rapidly as older health-care plans are updated and renewed. See Interim Final Rules for Group Health Plans and Health Insurance Coverage Relating to Status as a Grandfathered Health Plan, 75 Fed.Reg. 34,538, 34,552 (June 17, 2010).
Finally, some religious employers are exempt from the contraception mandate, see 45 C.F.R. § 147.130(a)(1)(iv)(A), but “religious employer” was initially defined quite narrowly:
[A] “religious employer” [for purposes of an exemption from the contraception mandate] is an organization that meets all of the following criteria:
(1) The inculcation of religious values is the purpose of the organization.
(2) The organization primarily employs persons who share the religious tenets of the organization.
(3) The organization serves primarily persons who share the religious tenets of the organization.
(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended [covering the tax status of churches and their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of religious orders].
Id. § 147.130(a)(1)(iv)(B).
B. The Religious-Employer Controversy
The contraception mandate was instantly controversial.[4] The religious-employer exemption did not leave room for conscientious religious objectors other than houses of worship, their integrated affiliate organizations, and religious orders acting as such. In other words, the definition of “religious employer” was so circumscribed that it left out religious colleges and universities; religious hospitals and clinics; religious charities and social-service organizations; other faith-based nonprofits; and for-profit, closely held businesses managed in accordance with a religious mission or creed.
HHS responded to the outcry from these left-out employers by establishing a temporary “safe harbor” for certain non *662 profit religious organizations not covered by the exemption. See Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services, 77 Fed.Reg. at 8728. Eventually the agency proposed a revised definition of “religious employer” and an “accommodation” of a broader class of nonprofit religious organizations with objections to the mandated coverage. The new rules were proposed in final form on February 6, 2013, see Coverage of Certain Preventive Services, 78 Fed.Reg. 8456, published in final form on July 2, 2013, see 78 Fed.Reg. 39,870, and became effective August 1, 2013, see id.
As revised, the exemption drops the first three requirements of the earlier definition of “religious employer,” but the change is not intended to alter the exemption’s scope. “Religious employer” is now defined as “an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.” 45 C.F.R. § 147.131(a). The cross-reference is the tax exemption for churches and their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of religious orders. See 26 U.S.C. § 6033(a)(3)(A)(i), (iii). HHS has explained that “the simplified and clarified definition of religious employer does not expand the universe of religious employers that qualify for the exemption beyond that which was intended in the 2012 final regulations.” Coverage of Certain Preventive Services, 78 Fed.Reg. at 39,874. In other words, the exemption remains limited to “[hjouses of worship and their integrated auxiliaries.” Id.
Under the revised rule, certain nonprofit religiously affiliated employers may receive an “accommodation” — essentially, an attempted workaround whereby the objecting employer gives notice to its insurance carrier and the insurer issues a separate policy with the mandated coverage. The accommodation is limited to organizations that meet the following requirements:
(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.
(2) The organization operates as a nonprofit entity.
(3) The organization holds itself out as a religious organization.
(4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section ....
45 C.F.R. § 147.131(b). Notably for our purposes, neither the final religious-employer exemption nor the accommodation applies to for-profit employers with conscientious religious objections to providing the mandated coverage.
C. The Plaintiffs
1. The Kortes and K & L Contractors
Cyril and Jane Korte own and operate Korte & Luitjohan Contractors, Inc. (“K & L Contractors”), a construction company located in Highland, Illinois. K & L Contractors has approximately 90 full-time employees, 70 of whom belong to a union that sponsors their health-insurance plan. The company provides a health-care plan for the remaining 20 or so nonunion employees. Together, Cyril and Jane own about 87% of the stock of the corporation and are its only directors. Cyril is the president and Jane is the secretary of the company. As officers and directors, they set all company policy.
The Kortes are Catholic and follow the teachings of the Catholic Church regard *663 ing the sanctity of human life from conception to natural death and the moral wrongfulness of abortion, sterilization, and the use of abortifacient drugs and artificial means of contraception.' They seek to manage their company in accordance with their faith commitments. In August 2012 when the contraception mandate was finalized, the Kortes discovered that their then-existing health plan covered sterilization and contraception — coverage that they did not realize they were carrying. Because providing this coverage conflicts with their religious convictions, they began to investigate alternative health-care plans with the intention of terminating their existing plan and substituting one that conforms to the requirements of their faith.
The contraception mandate stood in their way. The company’s existing healthcare plan was set to renew on January 1, 2013, triggering the, requirements of the mandate and the large financial penalties and possible enforcement actions if they did not comply. As the Kortes understand their religious obligations, providing the mandated coverage would facilitate a grave moral wrong. On the other hand, following the teachings of their faith and refusing to comply would financially devastate K & L Contractors and the Kortes as its owners; at $100 per day per employee, the monetary penalties would total $730,000 per year.
The Kortes responded to the conflict between their legal and religious duties in two ways. First, they promulgated ethical guidelines for K & L Contractors memorializing the faith-informed moral limitations on the company’s provision of health-care benefits, including its inability to provide insurance coverage for -abortion, abortifa-cient drugs, artificial contraception, and sterilization.[5] Second, the Kortes and K & L Contractors filed suit in the Southern District of Illinois for a religious exemption from the mandate.
2. The Grotes and Grote Industries
The Grote Family owns and manages Grote Industries, Inc., a manufacturer of vehicle safety systems headquartered in Madison, Indiana.[6] Like the Kortes, the *664 members of the Grote Family are Catholic and they manage Grote Industries in accordance with their religious commitments, including Catholic moral téaching regarding the sanctity of human life and the wrongfulness of abortion, abortifacient drugs, artificial contraception, and sterilization.
Grote Industries has 1,148 full-time employees at various locations, including 464 in the United States. The company provides a health-care plan that is self-insured and renews annually on the first of every year. Consistent with the Grote Family’s Catholic faith, prior to January 1, 2013, the employee health-care plan did not cover contraception and sterilization procedures. Starting on that date, however, the requirements of the contraception mandate kicked in.
Like the Kortes and K & L Contractors, the Grote Family and Grote Industries object on religious grounds to providing coverage for contraception, abortion-inducing drugs, and sterilization procedures. But with its large full-time workforce, the company faced an annual penalty of almost $17 million if it did not comply with the mandate. The Grotes and Grote Industries filed suit in the Southern District of Indiana for a religious exemption from the mandate.
D. The Litigation
Both complaints name the Secretaries of HHS, Labor, and the Treasury as defendants and seek declaratory and injunctive relief against the contraception mandate. Both sets of plaintiffs allege that the mandate violates their rights under RFRA; the Free Exercise Clause, the Establishment Clause, and the Free Speech Clause of the First Amendment; and the Administrative Procedure Act. The Grote complaint adds a due-process claim. In both cases the plaintiffs moved for a preliminary injunction the day after filing suit, focusing primarily though not exclusively on their RFRA claims.
In Korte the district court in Southern Illinois denied the motion, concluding that the Kortes and K & L Contractors had not demonstrated a likelihood of success on the merits. Regarding the RFRA claim in particular, the judge held that although the Kortes and K & L Contractors are “persons” within the meaning of RFRA and may invoke the statute’s protection, the contraception mandate does not substantially burden their religious-exercise rights. This is so, the judge held, because the link between the mandated coverage and the acts condemned by the Kortes’ religion is too attenuated. In other words, the burden on religious exercise is insubstantial because the compelled provision of contraception coverage is too far removed from the independent decisions by plan participants and beneficiaries to use contraception. The court also found the free-exercise claim unlikely to succeed.
In Grote the district court in Southern Indiana likewise denied the motion, also concluding that the plaintiffs were not likely to succeed on their RFRA claim. Unlike her colleague in Southern Illinois, however, the Indiana judge doubted that a secular, for-profit corporation like Grote Industries has religious-exercise rights under RFRA. The judge did not decide the question, however, concluding instead that any burden on the Grotes or Grote Industries is insignificant because too many independent decisions separate the provision of the mandated coverage and the practices deemed immoral by the Catholic Church. The court also found the constitutional and Administrative Procedure Act claims unlikely to succeed.
*665 The case from Southern Illinois reached us first, just before the January 1, 2013 deadline for compliance with the mandate. The plaintiffs sought an injunction pending appeal. In a brief order and based on our early review of the merits, we provisionally held that the RFRA claim is likely to succeed and the balance of harms weighs in favor of the religious-liberty rights of the plaintiffs. See Korte v. Sebelius, No. 12-3841, 528 Fed.Appx. 583, 587-88, 2012 WL 6757353, *4-5 (7th Cir. Dec. 28, 2012). We enjoined enforcement of the mandate pending appeal. Id. at 588, 2012 WL 6757353, at *5. Our colleague dissented. Id. at 588-90, 2012 WL 6757353, at *5-6 (Rovner, J., dissenting).
On the strength of our provisional decision in Korte, the Grotes and Grote Industries returned to the district court in Southern Indiana and asked for reconsideration. The judge acknowledged the similarity between the two cases but declined to reconsider because our order in Korte had no precedential effect. The plaintiffs appealed and asked for an injunction pending appeal. Tracing our analysis in Korte, we granted the request and enjoined enforcement of the mandate pending appeal. Grote v. Sebelius, 708 F.3d 850, 853-55 (7th Cir.2013). Again, our colleague disagreed, filing a thoughtful dissent explaining her contrary position. Id. at 855-67 (Rovner, J., dissenting).
The appeals proceeded to full briefing, and we heard argument at the end of May. Since then, four circuits have reached decision in similar cases. The Tenth Circuit held that two closely held, for-profit businesses and their owners are likely to succeed on a claim for an exemption from the mandate under RFRA. Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114 (10th Cir.2013). The Sixth and Third Circuits disagree. Autocam Corp. v. Sebelius, 730 F.3d 618 (6th Cir.2013); Conestoga Wood Specialties Corp. v. Sec’y of the U.S. Dep’t of Health & Human Servs., 724 F.3d 377 (3d Cir.2013). The D.C. Circuit recently held that the owners of two closely held, for-profit businesses are likely to succeed on a RFRA challenge to the mandate, although their companies are not. Gilardi v. U.S. Dep’t of Health & Human Servs., No. 13-5069, 733 F.3d 1208, 2013 WL 5854246 (D.C.Cir. Nov. 1, 2013).
II. Analysis
These cases come to us on appeals from orders denying preliminary injunctive relief. See 28 U.S.C. § 1291. To win a preliminary injunction, the moving party must demonstrate that (1) it has no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied; and (2) there is some likelihood of success on the merits of the claim. See Ezell v. City of Chicago, 651 F.3d 684, 694 (7th Cir.2011). If the moving party meets this threshold burden, the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest. See Planned Parenthood of Ind., Inc. v. Comm’r of the Ind. State Dep’t of Health, 699 F.3d 962, 972 (7th Cir.2012); Ezell, 651 F.3d at 694. This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party’s favor. See Planned Parenthood, 699 F.3d at 972. The aim is to minimize the costs of a wrong decision. See Stutter, Inc. v. Steak N Shake Enters., Inc., 695 F.3d 676, 678 (7th Cir.2012). Our review proceeds on a split standard of review: We review legal conclusions de novo, findings of fact for clear error, and equitable balancing for abuse of discretion. Ezell, 651 F.3d at 694.
*666 Here, the analysis begins and ends with the likelihood of success on the merits of the RFRA claim. On the strength of that claim alone, preliminary injunctive relief is warranted; there is no need to remand for the district courts to weigh the injunction equities. Although the claim is statutory, RFRA protects First Amendment free-exercise rights, and “in First Amendment cases, ‘the likelihood of success on the merits will often be the determinative factor.’ ” ACLU of Ill. v. Alvarez, 679 F.3d 588, 589 (7th Cir.2012) (quoting Joelner v. Village of Washington Park, Ill., 878 F.3d 613, 620 (7th Cir.2004)). “This is because the ‘loss of First Amendment freedoms ... unquestionably constitutes irreparable injury.Id. (quoting Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion)). Moreover, once the moving party establishes a likelihood of success on the merits, the balance of harms “normally favors granting preliminary injunctive relief’ because “ ‘injunctions protecting First Amendment freedoms are always in the public interest.’ ” Id. at 590 (quoting Christian Legal Soc’y v. Walker, 453 F.3d 853, 859 (7th Cir.2006)). The government hasn’t addressed equitable balancing, conceding the point to the plaintiffs. So the appeals turn entirely on whether the plaintiffs’ RFRA claims are likely to succeed.
Two legal questions are contested: (1) is a secular, for-profit corporation a “person” under RFRA; and (2) does the'contraception mandate substantially burden the religious-exercise rights of any of the plaintiffs, individual or corporate? If the answer to these questions is “yes,” the government must discharge its burden of justifying the mandate under strict scrutiny. We conclude as follows: The corporate plaintiffs are “persons” under RFRA and may invoke the statute’s protection; the contraception mandate substantially burdens the religious-exercise rights of all of the plaintiffs; and the government has not carried its burden under strict scrutiny-
First, however, we clear away some possible jurisdictional objections.
A. Jurisdiction
Although the government never challenged jurisdiction, either in the district court or here, we have an independent obligation to satisfy ourselves that jurisdiction is secure before proceeding to the merits. See Minn-Chem, Inc. v. Agrium Inc., 683 F.3d 845, 853 (7th Cir.2012) (en banc); Carroll v. Stryker Corp., 658 F.3d 675, 680 (7th Cir.2011). There are two arguable jurisdictional issues lurking here: standing and the Anti-Injunction Act.[7]
*667 1. Standing
Article III of the Constitution limits the judicial power to “Cases” and “Controversies,” U.S. Const. art. III, § 2, cl. 1; Clapper v. Amnesty Int’l USA, —— U.S. -, 133 S.Ct. 1138, 1146, 185 L.Ed.2d 264 (2013), a limitation understood to confine the federal courts to “the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law,” Summers v. Earth Island Inst., 555 U.S. 488, 492, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009). The doctrine of standing enforces this limitation. Id.; Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To invoke the authority of a federal court, a litigant must have “an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant’s challenged action; and re-dressable by a favorable ruling.” Horne v. Flores, 557 U.S. 433, 445, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009).
The contraception mandate inflicts a concrete and particularized injury on all of the plaintiffs.[8] The mandate operates directly on K & L Contractors and Grote Industries, forcing them to provide contraception coverage in their employee health-care plans on pain of onerous financial penalties and the possibility of enforcement actions by federal regulators charged with implementing the Affordable Care Act.[9] The threat of financial penalty and other enforcement action is easily sufficient to establish standing to challenge the mandate prior to its enforcement. The companies need not violate the mandate and risk enforcement of the regulatory scheme before bringing suit. See Wis. Right to Life State Political Action Comm. v. Barland, 664 F.3d 139, 147 (7th Cir.2011). The “existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper [under Article III] because a probability of future injury counts as ‘injury’ for purposes of standing.” Bauer v. Shepard, 620 F.3d 704, 708 (7th Cir.2010).
The Kortes and Grotes also have Article III. standing, although this conclusion requires a bit more elaboration. The contraception mandate injures the individual plaintiffs in two concrete ways. First, because- corporate ownership is closely held, the mandate’s indirect effect on the financial interests of the Kortes and Grotes as controlling shareholders is a concrete injury sufficient to support Article III standing under Supreme Court and circuit precedent. See Franchise Tax Bd. of Calif. v. Alcan Aluminium Ltd., 493 U.S. 331, 336, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990) (indirect sole shareholders have Article III standing to challenge taxes assessed against their wholly owned subsidiaries); Rawoof v. Texor Petroleum Co., 521 F.3d 750, 756 (7th Cir.2008) (sole share-holder of a corporation operating a branded pe *668 troleum franchise has Article III standing to challenge franchisor’s termination of the franchise under the Petroleum Marketing Practices Act).
Second, the Kortes and the Grotes face an intangible but no less concrete injury to their religious-exercise rights. It is axiomatic that organizational associations, including corporations, act only through human agency. See Reich v. Sea Sprite Boat Co., 50 F.3d 413, 417 (7th Cir.1995) (“incorporeal abstractions act through agents”). As owners, officers, and directors of their closely held corporations, the Kortes and Grotes set all company policy and manage the day-to-day operations of their businesses. Complying "with the mandate requires them to purchase the required contraception coverage (or self-insure for these services), albeit .as agents of their companies and using corporate funds. But this conflicts with their religious commitments;- as they understand the requirements of their faith, they must refrain from putting this- coverage in place because doing so would, make them complicit in the morally wrongful act of another.
Compelling a person to do an act his religion forbids, or punishing him for an act his religion requires, are paradigmatic religious-liberty injuries sufficient to invoke the jurisdiction of the federal courts. See, e.g., Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal, 546 U.S. 418, 428, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006); Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); Thomas v. Review Bd. of the Ind. Emp’t Sec. DiV., 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).
Finally, we note that the shareholder-standing rule does not block the Kortes and Grotes from challenging the mandate. The rule is an aspect of third-party standing doctrine, which implements the general principle that litigants may not sue in federal court to enforce the rights of others. See Franchise Tax Bd., 493 U.S. at 336, 110 S.Ct. 661; Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); Rawoof, 521 F.3d at 757; MainStreet Org. of Realtors v. Calumet City, 505 F.3d 742, 745 (7th Cir.2007). Subject to certain exceptions, the rule “holds that a shareholder generally cannot sue for indirect harm he suffers as a result of an injury to the corporation.” Rawoof, 521 F.3d at 757 (citing Franchise Tax Bd., 493 U.S. at 336, 110 S.Ct. 661).
Like other rules of third-party standing, however, the shareholder-standing rule is a prudential limitation and does not affect the court’s authority to hear the case. “Prudential-standing doctrine ‘is not jurisdictional in the sense that Article III standing is.’ ” Id. at 756 (quoting Main-Street Realtors, 505 F.3d at 747). Unlike true jurisdictional rules, prudential limitations on standing can be waived. See G & S Holdings LLC v. Cont’l Cas. Co., 697 F.3d 534, 540 (7th Cir.2012); MainStreet Realtors, 505 F.3d at 747. By failing to raise the shareholder-standing rule in the district court or here, the government waived it. Although we have the discretion to overlook the waiver, see Rawoof, 521 F.3d at 756-57; MainStreet Realtors, 505 F.3d at 747, doing so here would be pointless. A well-established exception allows “a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation’s rights are also implicated.” Franchise Tax Bd., 493 U.S. at 336, 110 S.Ct. 661. The Kortes and the *669 Grotes fall comfortably within the exception; they have a direct and personal interest in vindicating their individual religious-liberty rights, even though the rights of their closely held corporations are also at stake.
2. The Anti-Injunction Act
The Anti-Injunction Act provides that “no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.” 26 U.S.C. § 7421(a). The Act “protects the Government’s ability to collect a consistent stream of revenue! ] by barring litigation to enjoin or otherwise obstruct the collection of taxes.” NFIB, 132 S.Ct. at 2582; see also Hibbs v. Winn, 542 U.S. 88, 103, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004); Bob Jones Univ. v. Simon, 416 U.S. 725, 736, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974); Enochs v. Williams Packing & Navigation Co., 370 U.S. 1, 7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962). By operation of the Act, a tax ordinarily may be challenged only in a suit for a refund after it is paid. NFIB, 132 S.Ct. at 2582; Bob Jones Univ., 416 U.S. at 736-37, 94 S.Ct. 2038.
The Anti-Injunction Act does not apply here.[10] These are not suits “for the purpose of’ restraining the assessment or collection of a tax. The suits seek relief from a regulatory mandate that exists separate and apart from the assessment or collection of taxes. The contraception mandate is not itself a tax provision; its location within the United States Code and corresponding HHS regulations underscores as much.
The mandate was promulgated by HHS pursuant to authority delegated to it by a section of the Affordable Care Act that amends the Public Health Services Act. See 42 U.S.C. § 300gg-13(a)(4). The statutory component of the mandate imposes a general preventive-care requirement on all group health-care plans (including employer-sponsored plans) and issuers of individual and group health-insurance policies. See id.' The mandate is situated in the public-welfare title of the Code of Federal Regulations — more specifically, in the part containing regulations governing the group and individual health-insurance markets. See 45 C.F.R. § 147.130. The mandate is backed by stiff tax penalties against employers that fail to comply, see 26 U.S.C. §§ 4980D, 4980H, but there are additional consequences for noncompliance, including ERISA enforcement actions by the Secretary of Labor and plan participants and beneficiaries, see 29 U.S.C. §§ 1132, 1185d. Noncompliant health insurers are subject to the enforcement authority of the Secretary of HHS as well as the states in which they operate. See 42 U.S.C. § 300gg-22.
It should be clear from this description that the contraception mandate is not structured as a predicate to the imposition of a tax but is. instead an independent regulatory mandate. These lawsuits target the mandate itself.
It is true that the complaints name the Treasury Secretary as a defendant in addition to the Secretaries of HHS and Labor, and the plaintiffs have asked the court to enjoin the enforcement of the mandate by any of them. If the plaintiffs win an exemption from the mandate, they will not be liable for the tax penalty under *670 § 4980D and will be insulated from other means of enforcement as well. In that sense these lawsuits, if successful, will incidentally affect the corporate plaintiffs’ tax liability. But the Anti-Injunction Act does not reach “all disputes tangentially related to taxes.” Cohen v. United States, 650 F.3d 717, 727 (D.C.Cir.2011); see also Pendleton v. Heard, 824 F.2d 448, 451-52 (5th Cir.1987) (restraining the assessment or collection of a tax must be the primary purpose of the lawsuit, not an incidental effect of it, for the Anti-Injunction Act to apply); Linn v. Chivatero, 714 F.2d 1278, 1282 (5th Cir.1983) (same).
Still, there is no doubt that § 4980D, a provision in the Internal Revenue Code, is implicated in the remedial sweep of these cases, so we think it best to address whether it is properly classified as a “tax” within the meaning of the Anti-Injunction Act. It is not.
We acknowledge that Congress used the term “tax” in the text of § 4980D (and also in § 4980H, the alternative “shared responsibility payment” for employers that drop or otherwise go without an employee health-care plan). The language Congress uses to describe an exaction is ordinarily the best evidence of whether it meant the Anti-Injunction Act to apply. See NFIB, 132 S.Ct. at 2582-83. But Congress also called the payment specified in § 4980D a “penalty.” The statute was originally adopted as part of the Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104-191, 110 Stat.1936, and was titled “Penalty on Failure to Meet Certain Group Health Plan Requirements,” see id. § 402, 110 Stat.1936, 2084 (emphasis added). The language Congress used is contradictory and thus inconclusive.
Other features of § 4980D confirm that the provision is meant to penalize employers for noncompliance with the various mandates in the Affordable Care Act and its implementing regulations. The sheer size of the required payment fairly screams “penalty.” Any failure to provide the mandated minimum coverage — no matter how significant the deviation — costs the employer a whopping $100 per day per employee. See 26 U.S.C. § 4980D(b). Exacting such a high price for noncompliance suggests that the congressional objective is punitive. See Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc., 651 F.3d 722, 729 (7th Cir.2011) (“[A] tax might be so totally punitive in pin-pose and effect that, since nomenclature is unimportant, it should be classified as a fine rather than a tax.”) (applying the parallel Tax Injunction Act, which protects the collection of state taxes).
When Congress regulates private conduct and makes noncompliance painful by exacting severe and disproportionate monetary consequences, the primary purpose of the scheme must be understood as regulatory and punitive rather than revenue raising. See Robertson v. United States, 582 F.2d 1126, 1128 (7th Cir.1978) (the Anti-Injunction Act does not apply to “the exaction of a purely regulatory tax”). The obvious aim of § 4980D is not to raise revenue but to achieve broad compliance with the regulatory regime through deterrence and punishment. This is so even though the exaction generates some reve-' nue because “deterrence is never perfect.” Empress Casino, 651 F.3d at 728-29; see also Retail Indus. Leaders Ass’n v. Fielder, 475 F.3d 180, 189 (4th Cir.2007) (the Tax Injunction Act does not apply to a challenge to Maryland’s “Fair Share Act” requiring a minimum level of spending on employee health-care benefits).
The statute also contains several exceptions based on the employer’s scienter, see 26 U.S.C. § 4980D(c), a key indication that the payment is a penalty, not a tax. See *671 NFIB, 132 S.Ct. at 2595 (“[S]cienter requirements are typical of punitive statutes, because Congress often wishes to punish only those who intentionally break the law.”); Bailey v. Drexel Furniture Co. (Child Labor Tax Case), 259 U.S. 20, 37, 42 S.Ct. 449, 66 L.Ed. 817 (1922) (“Scien-ter[ ][is] associated with penalties, not with taxes.”). Finally, the $100-per-day-per-employee formula is repeated verbatim in 42 U.S.C. § 300gg-22(b)(2)(C)(ii), which authorizes the Secretary of HHS to impose the same sort of penalty on noncompliant insurers that § 4980D(b)(1) imposes on noncompliant employers.
Together, these aspects of the regulatory scheme all point in the same direction: Section 4980D is a penalty for noncompliance with the regulatory mandates on employer-based health-care plans. It is not a tax for purposes of the Anti-Injunction Act. By parallel reasoning the same is true of the alternative payment in § 4980H. This conclusion comports with the Supreme Court’s decision in NFIB, which held that the Affordable Care Act’s “shared responsibility payment” for noncompliance with the individual insurance mandate is not a tax for purposes of the Anti-Injunction Act. 132 S.Ct. at 2582-84. Here, as in NFIB, the- Anti-Injunction Act does not block a decision on the merits.
B. The RFRA Claim
In Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872, 883-90, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court held that the religious freedom guaranteed by the Free Exercise Clause of the First Amendment does not require religious exemptions from facially neutral laws of general applicability.[11] Smith altered the then-prevailing standard of Sherbert v. Verner, 374 U.S. at 406-07, 83 S.Ct. 1790, and Wisconsin v. Yoder, 406 U.S. at 220-21, 92 S.Ct. 1526, which applied strict scrutiny to laws that had the effect of burdening religious practices. Under Sherbert and Yoder, a substantial burden on religious exercise — even one arising from the application of a religion-neutral, generally applicable law — was unconstitutional unless the government could show .that the burden was the least restrictive means of furthering a compelling public interest. Smith changed that understanding of the free-exercise right. The Court held that neutral laws of general applicability need only satisfy the basic test for rationality that applies to all laws; if a law incidentally burdens the exercise of religion, the Constitution does not require an exemption. Smith, 494 U.S. at 878-79, 888-90, 110 S.Ct. 1595.
Congress responded to this shift in free-exercise doctrine by enacting RFRA, “a statutory rule comparable to the constitutional rule rejected in Smith.” O Centro Espirita, 546 U.S. at 424, 126 S.Ct. 1211; see also Cutter v. Wilkinson, 544 U.S. 709, 714-15, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005); City of Boerne v. Flores, 521 U.S. 507, 512, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). RFRA creates a broad statutory right to case-specific exemptions from laws that substantially burden religious exercise even if the law is neutral and generally applicable, unless the government can satisfy the compelling-interest test. RFRA represents a congressional judgment that the rule of -Smith is insufficiently protective of religious liberty.[12] Congress filled *672 the gap by expressly “requiring] accommodation rather than neutrality.” O’Bryan v. Bureau of Prisons, 349 F.3d 399, 401 (7th Cir.2003).
RFRA’s general rule is as follows:
Free exercise of religion protected
(a) In general
Government shall not substantially burden a person’s exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.
42 U.S.C. § 2000bb-1. The exception is as follows:
(b) Exception
Government may substantially burden a person’s exercise of religion only if it demonstrates that duplication of the burden to the person—
(1) is in furtherance of a compelling governmental’interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.
Id.[13] Any “person whose religious practices are burdened in violation of RFRA ‘may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief.’ ” O Centro Espirita, 546 U.S. at 424, 126 S.Ct. 1211 (quoting 42 U.S.C. § 2000bb-1(c)).
RFRA applies retrospectively and prospectively to “all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after” its effective date. 42 U.S.C. § 2000bb-3(a). Prospective application is qualified by the rule that “statutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute as modified.” Dorsey v. United States, — U.S. -, 132 S.Ct. 2321, 2331, 183 L.Ed.2d 250 (2012). RFRA accounts for this principle too; the statute does not apply to a subsequently *673 enacted law if it “explicitly excludes such application by reference to this chapter.” 42 U.S.C. § 2000bb-3(b). We note the qualifier only to explain how RFRA works; it has no bearing here. The Affordable Care Act does not explicitly exclude application of RFRA.
Congress’s protective stan'ce in favor of religious accommodation ' could not be clearer. RFRA’s statement of purpose explicitly reaffirms our national commitment to the “free exercise of religion as an unalienable right,” id. § 2000bb(a)(l), existing prior to and above ordinary law. RFRA is structured as a “sweeping ‘super-statute,’ cutting across all other federal statutes (now and future, unless specifically exempted) and modifying their reach.” Michael Stokes Paulsen, A RFRA Runs Through It: Religious Freedom and the U.S.Code, 56 Mont. L.Rev. 249, 253 (1995). It is “both a rule of interpretation” and “an exercise of general legislative supervision over federal agencies, enacted pursuant to each of the federal powers that gives rise to legislation or agencies in the first place.” Douglas Laycock & Oliver S. Thomas, Interpreting the Religious Freedom Restoration Act, 73 Tex. L.Rev. 209, 211 (1994); see also Nicholas Quinn Rosen-kranz, Federal Rules of Statutory Interpretation, 115 . Haev. L.Rev. 2085, 2110 (2002) (explaining the function of generally applicable statutory rules of interpretation).
In short, RFRA operates as a kind of utility remedy for the inevitable clashes between religious freedom and the realities of the modern welfare state, which regulates pervasively and touches nearly every aspect of social and economic life. See Thomas C. Berg, What Hath Congress Wrought? An Interpretative Guide to the Religious Freedom Restoration Act, 39 Vill. L.Rev. 1, 25-26 (1994). Judges are assigned the task of mediating these conflicts. RFRA makes that role clear, “mandating consideration, under the compelling interest test, of exceptions to rules of general applicability.” O Centro Espirita, 546 U.S. at 436, 126 S.Ct. 1211 (internal quotation marks and alteration marks omitted). Congress has instructed the judiciary to hold the entire federal regulatory apparatus to the standard of Sherbert, unless a statute specifically says otherwise.
Once a RFRA claimant makes a prima facie case that the application of a law or regulation substantially burdens his religious practice, the burden shifts to the government to justify the burden under strict scrutiny. O Centro Espirita, 546 U.S. at 428, 126 S.Ct. 1211. “Congress’s express decision to legislate the compelling interest test indicates that RFRA challenges should be adjudicated in the same manner as constitutionally mandated applications of the test....” Id. at 430, 126 S.Ct. 1211. Thus, in RFRA litigation, as in First Amendment litigation, “the burdens at the preliminary injunction stage track the burdens at trial.” Id. at 429, 126 S.Ct. 1211.
1. For-Profit Corporations as RFRA “Persons ”
RFRA’s general rule prohibits the federal government from placing substantial burdens on “a person’s exercise of religion” absent compelling justification, and only then if the burden is the least restrictive means of furthering the compelling governmental objective. As originally enacted, RFRA defined “exercise of religion” as “the exercise of religion under the First Amendment to the Constitution.” Pub.L. No. 103-141, § 5, 107 Stat. 1488, 1489 (1993).. Congress amended the definition in 2000 with the enactment of the Religious Land Use and Institutionalized *674 Persons Act (“RLUIPA”), 42 U.S.C. §§ 2000cc et seq., making the definitions in the two statutes uniform. The term “exercise of religion” in RFRA is now defined by cross-reference to the definition of “religious exercise” in RLUIPA: “The term ‘religious exercise’ includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.” Id. §§ 2000cc-5(7)(A), 2000bb-2(4). This definition is undeniably very broad, so the term “exercise of religion” should be understood in a generous sense.
RFRA does not define “person.” This brings the Dictionary Act into play.[14] The definition there expressly includes corporations: “In determining the meaning of any Act of Congress, unless the context indicates otherwise[,] ... the word[ ] ‘person’ ... inelude[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.... ” 1 U.S.C. § 1 (emphasis added). By operation of this omnibus definition, the term “person” in RFRA includes corporations, unless the context indicates otherwise.
To determine whether the context “indicates otherwise,” the Supreme Court has instructed us not to stray too far from the statutory text. See Rowland v. Calif. Men’s Colony, Unit II Men’s Advisory Council, 506 U.S. 194, 199-200, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993). “‘Context’ here means the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts.... ” Id. at 199, 113 S.Ct. 716. The inquiry basically asks whether the definition in the Dictionary Act is a “poor fit” with the text of the statute:
Where a court needs help is in the awkward case where Congress provides no particular definition, but the definition in 1 U.S.C. § 1 seems not to fit. There it is that the qualification “unless the context indicates otherwise” has a real job to do, in excusing the court from forcing a square peg into a round hole.
The point at which the indication of particular meaning becomes insistent enough to excuse the poor fit is of course a matter of judgment....
Id. at 200, 113 S.Ct. 716.
Nothing in RFRA suggests that the Dictionary Act’s definition of “person” is a “poor fit” with the statutory scheme. To use the Supreme Court’s colloquialism, including corporations in the universe of “persons” with rights under RFRA is not like “forcing a square peg into a round hole.” Id. A corporation is just a special form of organizational association. No one doubts that organizational associations can engage in religious practice. The government accepts that some corporations — religious nonprofits — have religious-exercise rights under both RFRA and the Free-Exercise Clause. As evidence of this, the contraception mandate exempts a class of religious organizations — i.e., churches and their integrated auxiliaries, see 45 C.F.R. § 147.131(a) — whether or not they conduct their activities in the corporate form (as many of them do). HHS also extends its “accommodation” to a broader set of religiously affiliated nonprofit corporations. See id. § 147.131(b).
Indeed, the Supreme Court has enforced the RFRA rights of an incorporated religious sect, see O Centro Espirita, 546 U.S. at 439, 126 S.Ct. 1211, aff'g 389 F.3d 973, 973 (10th Cir.2004) (en banc) (identifying *675 the plaintiff church as “a. New Mexico corporation”), and the free-exercise rights of an incorporated church, see Lukumi, 508 U.S. at 525, 547, 113 S.Ct. 2217. The church corporations in these cases were not in court solely asserting the rights of their members based on associational standing; they were asserting their own rights, too.[15] Accordingly, we take it as both conceded and noncontroversial that the use of the corporate form and the associated legal attributes of that status— think separate legal personhood, limitations on owners’ liability, special tax treatment — -do not disable an organization from engaging in the exercise of religion within the meaning of RFRA (or the Free Exercise Clause, for that matter).
The government draws the line at religiously affiliated nonprofit corporations. That line is nowhere to be found in the text of RFRA or any related act of Congress. Nor can it be found in the statute’s broader contextual purpose, assuming we were to venture beyond the textual inquiry envisioned by the Supreme Court for resolving Dictionary Act questions. The government argues that a religious/nonprofit limitation can be found by implication from judicial interpretations of two unrelated employment-discrimination statutes — namely, Title VII and the Americans with Disabilities Act (“ADA”) — both of which contain targeted exemptions for religious employers. We are not convinced.
Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of religion. See 42 U.S.C. § 2000e-2. Certain religious employers are exempt from this part of Title VII and may take religion into account in making employment decisions: “This subchapter shall not apply ... to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion....” Id. § 2000e-1(a). The ADA, which prohibits employment discrimination on the basis of disability, contains a similar exemption for religious employers. See id. § 12113(d)(1)-(2). Some lower courts have developed multifactor tests to determine when Title VIPs religious-employer exemption applies; the nonprofit status of the employer, is considered a relevant factor. See, e.g., Spencer v. World Vision, Inc., 633 F.3d 723, 727 (9th Cir.2011) (en banc) (per curiam); LeBoon v. Lancaster Jewish Cmty. Ctr. Ass’n, 503 F.3d 217, 226 (3d Cir.2007); Univ. of Great Falls v. NLRB, 278 F.3d 1335, 1343-44 (D.C.Cir.2002) (applying a religious-employer exemption implied by the Supreme Court as a matter of constitutional avoidance to limit the reach of the National Labor Relations Act); Killinger v. Samford Univ., 113 F.3d 196, 198-99 (11th Cir.1997); EEOC v. Townley Eng’g & Mfg. Co., 859 F.2d 610, 618-19 (9th Cir.1988). Relying on this line of cases, the government argues that Congress “carried forward” a nonprofit limitation when it enacted RFRA.
Never mind that much of this caselaw postdates the enactment of RFRA. The more important point is'that a handful of lower-court decisions applying an interpretive gloss to Title VIPs religious-employer exemption hardly implies that Congress meant to limit RFRA in the same way. As the. Tenth Circuit noted in Hobby Lobby, the government asks us to infer from con *676 gressional silence that a “similar narrowing construction ] should be imported into” RFRA. 723 F.3d at 1130. The Tenth Circuit found this argument “strained,” id., and so do we. If Congress intended a nonprofit limitation in RFRA, surely there would be some hint of it in the statutory text.
The government also relies on the Supreme Court’s decision in Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). We do not understand why. Amos rejected an Establishment Clause challenge to Title VII’s religious-employer exemption. Id. at 335-39, 107 S.Ct. 2862. The case does not advance the government’s position here.
To the contrary, the church labor-relations cases illuminate a fundamental flaw in the government’s argument — its failure to recognize that RFRA protects religious liberty more broadly than the religious-employer exemptions in Title VII and the ADA. To see how, it’s helpful to return to some first principles of free-exercise doctrine.
It’s well understood that the Free Exercise Clause protects “first and foremost, the right to believe and profess,” but also the right to engage in religiously motivated conduct. Smith, 494 U.S. at 877, 110 S.Ct. 1595. (“The ‘exercise of religion’ often involves not only belief and profession but the performance of (or abstention from) physical acts.... ”); see also Bob Jones Univ. v. United States, 461 U.S. 574, 603, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) (“[T]he Free Exercise Clause provides substantial protection for lawful conduct grounded in religious belief....”); Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (The “[First] Amendment embraces two concepts[ ] — [the] freedom to believe and freedom to act.”). This doctrine reflects the original understanding of the right. See Michael W. McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L.Rev. 1409, 1488 (1990) (“[T]he term ‘free exercise’ makes clear that the clause protects religiously. motivated conduct as well as belief.”).
The right to believe and profess is absolute. See Bob Jones Univ. v. United States, 461 U.S. at 603, 103 S.Ct. 2017 (the Free Exercise Clause is “an absolute prohibition against governmental regulation of religious beliefs”); Sherbert, 374 U.S. at 402, 83 S.Ct. 1790 (“The door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious beliefs as such.... ” (emphasis added)); W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (“If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by work or act their faith therein.”). Religiously motivated conduct is necessarily subject to some regulation for the essential public good. Sherbert, 374 U.S. at 403, 83 S.Ct. 1790 (religiously motivated conduct may be regulated to prevent “substantial threat[s] to public safety, peace or order”).
Free-exercise problems usually arise when a law, regulation, or some action of a public official interferes with a religiously motivated practice, forbearance, or other conduct. These claims present in distinct ways, reflecting different dimensions of the right. See generally Douglas Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy, 81 Colum. L.Rev. 1373, 1388-89 (1981); Eugene Volokh, A Common-Law Model *677 for Religious Exemptions, 46 UCLA L.Rev. 1465,1505-08 (1999).
One obvious and intuitive aspect of religious liberty is the right of conscientious objection to laws and regulations that conflict with conduct prescribed or proscribed by an adherent’s faith. Sherbert, Yoder, and Thomas are the paradigm cases in this category. In Sherbert a Seventh-day Adventist was denied unemployment compensation benefits after she lost her job for refusing to work on her Sabbath day. 374 U.S. at 399-400, 83 S.Ct. 1790. In Yoder Amish families challenged the application of a state compulsory-education law requiring their children to attend public school through age 16. 406 U.S. at 207-09, 92 S.Ct. 1526. In Thomas a Jehovah’s Witness was denied unemployment compensation benefits after he was fired for declining a job transfer to a department that produced war materials. 450 U.S. at 709-12, 101 S.Ct. 1425. In all three cases, the claimants asserted a conscientious objection to legal burdens placed on their religiously motivated conduct. In all three the Supreme Court held that the Free Exercise Clause required an exemption. See id. at 718-19, 101 S.Ct. 1425; Yoder, 406 U.S. at 234-36, 92 S.Ct. 1526; Sherbert, 374 U.S. at 398-99, 83 S.Ct. 1790.
A different aspect of religious liberty protects, broadly speaking, the autonomy of the church. As the Supreme Court explained in Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC, — U.S.-, 132 S.Ct. 694, 706, 181 L.Ed.2d 650 (2012), this strand of religious-liberty doctrine “gives special solicitude to the rights of religious organizations” as religious organizations, respecting their autonomy to shape their own missions, conduct their own ministries, and generally govern themselves in accordance with their own doctrines as religious institutions. Id. at 704-06. The paradigm cases in this category are Hosanna-Tabor itself, which recognized the right of churches to choose their own ministers (broadly understood) and adopted a constitutional ministerial, exception to laws regulating employment discrimination, see id. at 705-06, and the church-property cases, see Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem’l Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952).
The church-autonomy doctrine respects the authority of churches to “select their own leaders, define their own doctrines, resolve their own disputes, and run their own institutions” free from governmental interference. Laycock, Towards a General Theory of the Religion Clauses, supra, at 1389. This dimension of religious liberty has a foothold in both Religion Clauses, see Hosanna-Tabor, 132 S.Ct. at 702, and is perhaps best understood as marking a boundary between two separate polities, the secular and the religious, and acknowledging the prerogatives of each in its own sphere. For example, in Milivojevich, a church-property case, the Court explained that the First Amendment “permit[s] hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters.” 426 U.S. at 724, 96 S.Ct. 2372. When a church tribunal or other religious authority decides an internal dispute, “the Constitution requires ... civil courts [to] accept th[at] decision[ ] as binding.” Id. at 725, 96 S.Ct. 2372; see also Richard W. Garnett, A Hands-Off Approach to Religious Doctrine: What Are We Talking About?, 84 Notre Dame L.Rev. 837, 861 (2009) (explaining that the church- *678 autonomy doctrine recognizes that secular tribunals “lack the power to answer some questions — religious questions — whose resolution is, under an appropriately pluralistic political theory, left to other institutions”).
Two related principles are at work in these cases. First, civil authorities have no say over matters of religious governance; and second, secular judges must defer to ecclesiastical authorities on questions properly within their domain. These limitations arise from the justification for the different aspects of religious liberty secured by the Religion Clauses. See Douglas Laycock, Church Autonomy Revisited, 7 Geo. J.L. & Pub. Pol’y 253, 260-65 (2009). As the Supreme Court explained in Hosannctr-Tabor:
Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group’s right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits governmental involvement in such ecclesiastical decisions.
132 S.Ct. at 706.
In this way the Religion Clauses work together to protect the institutional freedom of the church “for itself, and not simply as a proxy for the religious-liberty rights of individuals,” in light of the Constitution’s ordering of the relationship between religion and government. Richard W. Garnett, Standing, Spending, and Separation: How the No-Establishment Rule Does (and Does Not) Protect Conscience, 54 Vill. L.Rev. 655, 674 (2009); see also Paul Horwitz, Churches as First Amendment Institutions: Of Sovereignty and Spheres, 44 HaRV. C.R.-C.L. L.Rev. 79, 116-22 (2009).[16]
The religious-employer exemptions in Title VII and the ADA are legislative applications of the church-autonomy doctrine. By their terms the exemptions are limited to religiously affiliated employers, a limitation that makes sense in light of the rationale for the rule. The exemption is categorical, not contingent; there is no balancing of competing interests, public or private. In other words, where it applies, the church-autonomy principle operates as a complete immunity, or very nearly so. Such a strong hands-off principle isn’t justified for organizational associations that are not religiously affiliated.
In contrast, the judicial remedy in RFRA is both broader and more flexible. It covers religious organizations as such, but it does not stop there. The remedy is available to any sincere religious objec *679 tor — individuals and organizations alike— and its organizational applications are not limited to religiously. affiliated organizations. The exemption is.comprehensive in that it applies across the United States Code and Code of Federal Regulations and restrains the conduct of all federal officials. But it can be overridden by a sufficiently strong governmental interest.
For these reasons, the cases interpreting the Title VII and ADA exemptions do not shed light on the scope of the RFRA exemption. The government’s proposed exclusion of secular, for-profit corporations finds no support in the text or relevant context of RFRA or any related statute.
That’s enough to resolve the matter, but it’s worth briefly exploring whether RFRA’s animating purpose provides a clue that it is not meant to apply to secular, for-profit corporations. Congress was clear that RFRA codifies pre-Smith free-exercise jurisprudence — in particular, the rule of Sherbert and Yoder — so if the Supreme Court’s pre-Smith free-exercise cases categorically excluded secular, for-profit corporations, then perhaps RFRA should be understood that way, too.
We begin by reiterating two doctrinal points we made a moment ago: (1) the Free Exercise Clause protects not just belief and profession but also religiously motivated conduct; and (2) individuals and organizations — whether incorporated or not — can exercise religion. It’s common ground that nonprofit religious corporations exercise religion in the sense that their activities are religiously motivated. So unless there is something disabling about mixing profit-seeking and religious practice, it follows that a faith-based, for-profit corporation can claim free-exercise protection to the extent that an aspect of its conduct is religiously motivated.
We acknowledge the novelty of the question; the Supreme Court has never considered whether a for-profit corporation may assert a free-exercise claim. See Hobby Lobby Stores, Inc. v. Sebelius, — U.S. -, 133 S.Ct. 641, 643, 184 L.Ed.2d 448 (Sotomayor, Circuit Justice 2012) (“This Court has not previously addressed similar RFRA or free exercise claims brought by closely held for-profit corporations and their controlling shareholders.... ”). But the Court has on several occasions addressed the free-exercise rights of individuals engaged in commercial or profit-making activity.
We have already mentioned Thomas and Sherbert, both of which involved claimants who lost their jobs for refusing to work on days or in ways that would violate their faith. See Thomas, 450 U.S. at 709-11, 101 S.Ct. 1425; Sherbert, 374 U.S. at 399-400, 83 S.Ct. 1790. The cases challenged the denial of unemployment compensation benefits, but the background facts involved the loss of remunerative employment at a foundry and a mill. In other words, Eddie Thomas and Adell Sherbert were working for money yet they retained their free-exercise rights and were permitted to assert them against the denial of unemployment benefits. The Court held that Thomas and Sherbert could not be compelled to choose between their livelihoods and their faith. See Thomas, 450 U.S. at 717, 101 S.Ct. 1425 (“Here, as in Sherbert, the employee was put to a choice between fidelity to religious belief or cessation of work; the coercive impact on Thomas is indistinguishable from Sherbert.... ”); Sherbert, 374 U.S. at 404, 83 S.Ct. 1790 (“The [unemployment compensation] ruling forces [Adell Sherbert] to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other *680 hand.”)- If the government is correct that entering the marketplace and earning money forfeits free-exercise rights, then Thomas and Sherbert would have been decided differently.
In Braunfeld v. Brown, 366 U.S. 599, 600-02, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961), Jewish merchants brought a free-exercise challenge against Pennsylvania’s Sunday-closing law, which put them at a competitive disadvantage based on their Sabbath. Again, if profit-making alone was enough to disqualify the merchants from bringing the claim, the Court surely would have said so. It did not. Instead, the Court addressed and rejected their free-exercise claim on the merits. Id. at 608-09, 81 S.Ct. 1144.
In United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), an Amish farmer sought a religious exemption from the obligation to withhold and pay Social Security taxes for his employees, coreligionists who worked on his farm and in his carpentry shop. Id. at 254-55, 102 S.Ct. 1051. The Amish religion holds that members of the religious community must provide for their own needy and elderly. Id. The Social Security system exempts self-employed religious objectors but not employers, so the farmer asserted a constitutional right to an exemption. Id. at 255-56, 102 S.Ct. 1051. The Court held that “compulsory participation in the social security system interferes with the[ ] free exercise rights” of the Amish. Id. at 257, 102 S.Ct. 1051. But the Court concluded that the strong public interest in the financial soundness of the Social Security .system was enough to defeat the farmer’s claim for an exemption:
The tax system could not function if denominations were allowed to challenge the ... system because tax payments were spent in a manner that violates their religious beliefis].... Because the broad public interest in maintaining a sound-tax system is of such a high order, religious belief in conflict with the payment of taxes affords no basis for resisting the tax.
Id. at 260, 102 S.Ct. 1051.
Like the merchants in Braunfeld, the Amish farmer in Lee was engaged in farming and furniture-making not for subsistence but for profit. If moneymaking were enough to foreclose the claim, the Court would not have addressed the burden, on his free-exercise rights or the public interest in the sound administration of the Social Security system. Instead, the Court gave the claim plenary review and found a compelling reason to deny an exemption.
These cases show that far from categorically excluding profit-seekers from the scope of the free-exercise right, the Supreme Court has considered their claims on the merits, granting exemptions in some and not others based on the compelling-interest test.
The government relies on a concluding statement in Lee as support for its position that profit-making is incompatible with free-exercise rights:
Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs. When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.
Id. at 261, 102 S.Ct. 1051 (emphasis added).
*681 The government apparently reads this passage as foreclosing all religious-exercise claims arising in the course of commercial activity merely because the context is commercial. That reading is both unsound and extraordinary. Unsound because it would nullify the rest of the Court’s opinion, which considered the Amish farmer’s claim on the merits even though his activities were for profit; the commercial context did not defeat the claim. And extraordinary because it would leave religious exercise wholly unprotected in the commercial sphere. At bottom, the government’s argument is premised on a far-too-narrow view of religious freedom: Religious exercise is protected in the home and the house of worship but not beyond. Religious people do not practice their faith in that compartmentalized way; free-exercise rights are not so circumscribed.
If the government’s view is correct, commonplace religious practices normally thought protected would fall outside the scope of the free-exercise right. The Jewish deli is the usual example. On the government’s understanding of religious liberty, a Jewish restaurant operating for profit could be denied the right to observe Kosher dietary restrictions. That cannot be right. There is nothing inherently incompatible between religious exercise and profit-seeking. The better reading of the concluding dictum in Lee is that it foreshadowed the coming holding in Smith eight years later. The references to “incidental burdens” and “statutory schemes binding on others” suggest as much.
In short, nothing in the Supreme Court’s free-exercise jurisprudence prior to Smith categorically forecloses RFRA claims by profit-seeking entities.
For the sake of completeness, we note as well that nothing in the Court’s general jurisprudence of corporate constitutional rights suggests a nonprofit limitation on organizational free-exercise rights. Prior to Smith, and continuing to the present day, the Court has held that corporations may claim some but not all constitutional rights. See Darrell A.H. Miller, Guns, Inc.: Citizens United, McDonald, and the Future of Corporate Constitutional Rights, 86 N.Y.U. L.Rev. 887, 908-11 (2011) (collecting cases).
For example, long before Citizens United reinvigorated the political-speech rights of corporations, see Citizens United v. FEC, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), the Court confirmed that corporations have free-speech rights, see, e.g., Bd. of Trs. of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); Pac. Gas & Elec. Co. v. Pub. Utils. Comm’n of Cal., 475 U.S. 1, 8, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (plurality opinion); Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); First Nat’l Bank of Bos. v. Bellotti, 435 U.S. 765, 776, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); N.Y. Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Prior to Smith the Court held that the Fourth Amendment protected corporations from unreasonable searches and seizures. See Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920); Hale v. Henkel, 201 U.S. 43, 76, 26 S.Ct. 370, 50 L.Ed. 652 (1906), overruled on other grounds by Murphy v. Waterfront Comm’n of N.Y. Harbor, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). Corporations qualify as persons for at least some purposes under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. See Grosjean v. Am. Press Co., 297 U.S. 233, 244, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Covington & Lexing *682 ton Tpk. Rd. Co. v. Sandford, 164 U.S. 578, 592, 17 S.Ct. 198, 41 L.Ed. 560 (1896). But see Nw. Nat’l Life Ins. Co. v. Riggs, 203 U.S. 243, 255, 27 S.Ct. 126, 51 L.Ed. 168 (1906) (“The liberty referred to in th[e] [Fourteenth] Amendment is the liberty of natural, not artificial, persons.”). On the other hand, prior to Smith the Court excluded corporations from the Fifth Amendment privilege against self-incrimination, see Wilson v. United States, 221 U.S. 361, 383-84, 31 S.Ct. 538, 55 L.Ed. 771 (1911), and the emerging right of privacy, see United States v. Morton Salt Co., 338 U.S. 632, 652, 70 S.Ct. 357, 94 L.Ed. 401 (1950).
These cases do not yield a unifying theory of corporate constitutional rights, but Bellotti contains some language that might be read to suggest a general decisional approach: “Certain ‘purely personal’ guarantees, such as the privilege against compulsory self-incrimination, are unavailable to corporations and other organizations because the ‘historic function’ of the particular guarantee has been limited to the protection of individuals.” 435 U.S. at 778 n. 14, 98 S.Ct. 1407 (quoting United States v. White, 322 U.S. 694, 698-701, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944)). And this: “Whether or not a particular guarantee is ‘purely personal’ or is unavailable to corporations for some other reason depends upon the nature, history, and purpose of the particular constitutional provision.” Id. But the Court has never elaborated.
Ultimately, we don’t need to parse the cases on corporate constitutional rights too finely. We are confronted here with a question of statutory interpretation. Our task is to determine whether prior to Smith it was established that a closely held, for-profit corporation could not assert a free-exercise claim. It was not so established. We conclude that K & L Contractors and Grote Industries are “persons” within the meaning of RFRA.[17]
2. Substantial Burden
Our next question is whether the contraception mandate substantially burdens the plaintiffs’ exercise of religion. Recall that “exercise of religion” means “any exercise of religion, whether or not compelled by, or central to, a system of religious belief.” 42 U.S.C. § 2000cc-5(7)(A) (emphases added). At a minimum, a substantial burden exists when the government compels a religious person to “perform acts undeniably at odds with fundamental tenets of [his] religious beliefs.” Yoder, 406 U.S. at 218, 92 S.Ct. 1526. But a burden on religious exercise also arises when the government “put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.” Thomas, 450 U.S. at 718, 101 S.Ct. 1425; see also Nelson v. Miller, 570 F.3d 868, 878 (7th Cir.2009); Koger v. Bryan, 523 F.3d 789, 799 (7th Cir.2008). Construing the parallel provision in RLUIPA, we have held that a law, regulation, or other governmental command substantially burdens religious exercise if it “bears direct, primary, and fundamental responsibility for rendering [a] religious exercise ... effectively impracticable.” Civil Liberties for Urban Believers v. City of Chicago, 342 *683 F.3d 752, 761 (7th Cir.2003). The same understanding applies to RFRA claims.
Importantly, the substantial-burden inquiry does not invite the court to determine the centrality of the religious practice to the adherent’s faith; RFRA is explicit about that. And free-exercise doctrine makes it clear that the test for substantial burden does not ask whether the claimant has correctly interpreted his religious obligations. See Lee, 455 U.S. at 257, 102 S.Ct. 1051; Thomas, 450 U.S. at 715-16, 101 S.Ct. 1425. Indeed, that inquiry is prohibited. “[I]n this sensitive area, it is not within the judicial function and judicial competence to inquire whether the [adherent has] ... correctly perceived the commands of [his] ... faith. Courts are not arbiters of scriptural interpretation.” Thomas, 450 U.S. at 716, 101 S.Ct. 1425. It is enough that the claimant has an “honest conviction” that what the government is requiring, prohibiting, or pressuring him to do conflicts with his religion. Id.; see also id. at 715, 101 S.Ct. 1425 (“Thomas drew a [religious] line, and it is not for us to say that the line he drew was an unreasonable one.”).
Checking for sincerity and religiosity is important to weed out sham claims. The religious objection must be both sincere and religious in nature. Cf. United States v. Seeger, 380 U.S. 163, 184-86, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (military-conscription exemption applies only to objections based on sincerely held religious beliefs as opposed to philosophical views or a personal moral code). These are factual inquiries within the court’s authority and competence. But we agree with our colleagues in the Tenth Circuit that the substantial-burden test under RFRA focuses primarily on the “intensity of the coercion applied by the government to act contrary to [religious] beliefs.” Hobby Lobby, 723 F.3d at 1137. Put another way, the substantial-burden inquiry evaluates the coercive effect of the governmental pressure on the adherent’s religious practice and steers well clear of deciding religious questions.
On this understanding of substantial burden, there can be little doubt that the contraception mandate imposes a substantial burden on the plaintiffs’ religious exercise. K & L Contractors and Grote Industries must pay $100 per day per employee if they do not include coverage for contraception and sterilization in their employee health-care plans. The Kortes and the Grotes as corporate owners and managers must arrange for their companies to provide- the mandated coverage. They object on religious grounds to doing so, explaining that providing this coverage would make them complicit in a grave moral wrong and would undermine their ability to give witness to the moral teachings of their church. No one questions their sincerity or the religiosity of their objection.[18]
In short, the federal government has placed enormous pressure on the plaintiffs to violate their religious beliefs and conform to its regulatory mandate. Refusing *684 to comply means ruinous fines, essentially forcing the Kortes and Grotes to choose between saving their companies and following the moral teachings of their faith. This is at least as direct and substantial a burden as the denial of unemployment compensation benefits in Sherbert and Thomas, and the obligation to withhold and pay Social Security taxes in Lee. •
The government takes a different tack on this question, arguing that the mandate’s burden on religious exercise is insubstantial because an employee’s decision to use her insurance coverage to purchase contraception or sterilization services “cannot be attributed to” the Kortes or Grotes. In a different twist on the same argument, the government also insists that any burden on the plaintiffs’ religious exercise is too “attenuated” to count as “substantial” because the provision of contraception coverage is several steps removed from an employee’s independent decision to use contraception. For support the government relies on Zelman v. Simmons-Harris, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002), and Board of Regents of the University of Wisconsin System v. Southworth, 529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). Neither case is relevant here.
Zelman upheld Ohio’s school-voucher program against an Establishment Clause challenge because the public funds flowed to religious schools only through the private choice of the students’ parents. 536 U.S. at 651-52, 122 S.Ct. 2460. South-worth rejected a free-speech challenge to a public university’s student-activity fee because the funds collected were allocated to student groups on a viewpoint-neutral basis, removing “ ‘any mistaken impression that the [student groups] speak for the [u]niversity’ ” or the objecting student. 529 U.S. at 233, 120 S.Ct. 1346 (quoting Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 841, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1993)). These cases raised questions about governmental endorsement of religion (Zelman) and unwanted speech (Southworth). The degree of separation between the government and the use of the funds was important to the constitutional analysis in each case, but it’s not a relevant consideration here.[19]
Aside from its misplaced reliance on Zel-man and Southworth, the government’s insistence that the burden is trivial or nonexistent simply misses the point of this religious-liberty claim. The government focuses on the wrong thing — the employee’s use of contraception — and addresses the wrong question — how many steps separate the employer’s act of paying for contraception coverage and an employee’s decision to use it.
To the first point: Although the plaintiffs object on religious grounds to the use of contraception, abortifacient drugs, and sterilization, it goes without saying that they may neither inquire about nor interfere with the private choices of their employees on these subjects. They can and do, however, object to being forced to pro *685 vide insurance coverage for these drugs and services in violation of their faith. As we explained in our order granting an injunction pending appeal, “[t]he religious-liberty violation at issue here inheres in the coerced coverage of contraception, abortifacients, sterilization, and related services, not — or perhaps more precisely, not only — in the later purchase or use of contraception or related services.” Korte, 528 Fed.Appx. 583, 587, 2012 WL 6757853, at *3.
The government’s “attenuation” argument posits that the mandate is too loosely connected to the use of contraception to be a substantial burden on religious exercise. Because several independent decisions separate the employer’s act of providing the mandated coverage from an employee’s eventual use of contraception, any complicity problem is insignificant or nonexistent. This argument purports to resolve the religious question underlying these cases: Does providing this coverage impermissibly assist the commission of a wrongful act in violation of the moral doctrines of the Catholic Church? No civil authority can decide that question.
To repeat, the judicial duty to decide substantial-burden questions under RFRA does not permit the court to resolve religious questions or decide whether the claimant’s understanding of his faith is mistaken. Lee, 455 U.S. at 257, 102 S.Ct. 1051; Thomas, 450 U.S. at 715-16, 101 S.Ct. 1425. The question for us is not whether compliance with the contraception mandate can be reconciled with the teachings of the Catholic Church. That’s a question of religious conscience for the Kortes and the Grotes to decide. They have concluded that their legal and religious obligations are incompatible: The contraception mandate forces them to do what their religion tells them they must not do. That qualifies as a substantial burden on religious exercise, properly understood.
The plaintiffs have established a prima facie case under RFRA. The government must justify the mandate under the compelling-interest test.
3. Compelling-Interest Test
RFRA requires the government to shoulder the burden of demonstrating that applying the contraception mandate “is the least restrictive means of furthering [a] compelling governmental interest.” 42 U.S.C. § 2000bb-1(b). The Supreme Court has instructed us to look beyond “broadly formulated interests justifying the general applicability of government mandates” and “scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants.” O Centro Espirita, 546 U.S. at 431, 126 S.Ct. 1211. In other words, under RFRA’s version of strict scrutiny, the government must establish a compelling, and specific justification for burdening these claimants.
The compelling-interest test generally requires a “high degree of necessity.” Brown v. Entm’t Merchs. Ass’n, — U.S. -, 131 S.Ct. 2729, 2741, 180 L.Ed.2d 708 (2011). The government must “identify an ‘actual problem’ in need of solving, and the curtailment of [the right] must be actually necessary to the solution.” Id. at 2738 (citations omitted). In the free-exercise context, “only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.” Yoder, 406 U.S. at 215, 92 S.Ct. 1526. “[I]n this highly sensitive constitutional area, only the gravest abuses, endangering paramount interests, give occasion for permissible limitation.... ” Sherbert, 374 U.S. at 406, 83 S.Ct. 1790 (internal quotation marks and alteration omitted). *686 The regulated conduct must “pose[ ] some substantial threat to public safety, peace[,] or order.” Id. at 403, 83 S.Ct. 1790. Finally, “a law cannot be regarded as protecting an interest of the highest order ... when it leaves appreciable damage to that supposedly vital interest unprohibited.” Lukumi, 508 U.S. at 547, 113 S.Ct. 2217 (internal quotation marks omitted).
The government identifies two public interests — “public health” and “gender equality” — and argues that the contraception mandate furthers these interests by reducing unintended pregnancies, achieving greater parity in health-care costs, and promoting the autonomy of women both economically and in their reproductive capacities. This argument seriously misunderstands strict scrutiny. By stating the public interests so generally, the government guarantees that the mandate will flunk the test. Strict scrutiny requires a substantial congruity — a close “fit” — between the governmental interest and the means chosen to further that interest. Stating the governmental interests at such a high level of generality makes it impossible to show that the mandate is the least restrictive means of furthering them. There are many ways to promote public health and gender equality, almost all of them less burdensome on religious liberty.
We will translate a bit. The apparent aim of the mandate is to broaden access to free contraception and sterilization so that women might achieve greater control over their reproductive health. We accept this as a legitimate governmental interest. Whether it qualifies as an interest of surpassing importance is both contestable and contested.
In Lee the Supreme Court held that the sound financial administration of the Social Security system was a sufficiently compelling interest to override a religious objection to with-holding Social Security taxes. 455 U.S. at 260, 102 S.Ct. 1051. The government has not explained why free contraception deserves to be ranked as a governmental interest akin to the Social Security system in order of importance to the public good. Let’s assume for the sake of argument that it is. Even with that generous assist, the government has not come close to carrying its burden of demonstrating that it cannot achieve its policy goals in ways less damaging to religious-exercise rights.
Indeed, the government has not even tried to satisfy the least-restrictive-means component of strict scrutiny, perhaps because it is nearly impossible to do so here. The regulatory scheme grandfathers, exempts, or “accommodates” several categories of employers from the contraception mandate and does not apply to others (those with fewer than 50 employees). Since the government grants so many exceptions already, it can hardly argue against exempting these plaintiffs.[20] Moreover, there are many ways to increase access to free contraception without doing damage to the religious-liberty rights of conscientious objectors. The plaintiffs have identified a few: The government can provide a “public option” for contraception insurance; it can give tax incentives to contraception suppliers to provide these medications and services at no cost to consumers; it can give tax incentives to consumers of contraception and sterilization services. No doubt there are other options.
*687 The government has no real response to this argument. It has not made any effort to explain how the contraception mandate is the least restrictive means of furthering its stated goals of promoting public health and gender equality. We noted this shortcoming in our orders granting injunctions pending appeal. See Grote, 708 F.3d at 855; Korte, 528 Fed.Appx. at 587-88, 2012 WL 6757353, at *4. In light of this observation, we might have expected a better effort in the government’s merits briefing. We did not get it. The best the government could do was to insist that the least-restrictive-means test “has never been interpreted to require the government to subsidize private religious practices.”
That’s just an evasion o'f RFRA. Lifting a regulatory burden is not necessarily a subsidy, and it’s not á subsidy here. The plaintiffs are not asking the government to pay for anything. They are asking for relief from a regulatory mandate that coerces them to pay for something — insurance coverage for contraception — on the sincere conviction that doing so violates their religion. They have made a strong case that RFRA entitles them to that relief.
Our conclusion aligns us with the Tenth Circuit majority and Judge Jordan in dissent in the Third Circuit, Hobby Lobby, 723 F.3d at 1137-44; Conestoga Wood Specialties, 724 F.3d at 407-15 (Jordan, J., dissenting), and in some respects with the majority opinion in the D.C. Circuit, Gilardi, 733 F.3d at 1216-24, 2013 WL 5854246, at *7-15. The Third Circuit analyzed the identical issues very differently, concluding that “a for-profit, secular corporation - cannot engage in the exercise of religion,” and its owners “do not have viable- claims” against the contraception mandate because the mandate “does. not actually require [them] to do anything.” Conestoga Wood Specialties, 724 F.3d at 388-89. The Sixth Circuit reached a similar conclusion. Autocam, 730 F.3d at 624 (“The decision to comply with the mandate falls on Autocam, not the Kennedys.”); id. at 627 (“Congress did not intend the term ‘person’ to cover entities like Autocam when it enacted RFRA.”). For reasons that should be obvious by now, we respectfully disagree.
III. Conclusion
For the foregoing reasons, we ReveRSe and Remand with instructions to enter preliminary injunctions barring enforcement of the contraception mandate against the plaintiffs.

. The Employment Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq.

. See FDA, Birth Control: Medicines to Help You, http://www.fda.gov/ForConsumers/By Audience/ForWomen/FreePublications/ucm 313215.htm (last visited Nov. 7, 2013).

. In July the Treasury Department announced a one-year delay in the implementation of the so-called employer mandate. See Mark J. Mazur, Continuing to Implement the ACA in a Careful, Thoughtful Manner, Treasury Notes (July 2, 2013), http://www.treasury.gov/ connect/blog/pages/continuing-to-implement-the-aca-in-a-careful-thoughtful-manner-.aspx. The announcement did not mention the contraception mandate, which was already in effect. We assume that the postponement of the employer mandate has no effect on the contraception mandate; the government has not advised otherwise.

. The mandate prompted a proliferation of lawsuits by employers seeking exemptions on religious-liberty grounds. By one count more than 70 suits challenging the mandate are currently pending. See The Becket Fund for Religious Liberty, HHS Mandate Information Central, Thebecketfund.Org, http://www. becketfund.org/hhsinformationcentral.

. The company’s ethical guidelines are as follows:
1. As adherents of the Catholic faith, we hold to the teachings of the Catholic Church regarding the sanctity of human life from conception to natural death. We believe that actions intended to terminate an innocent human life by abortion, including abortion-inducing drugs, are gravely sinful. We also adhere to the Catholic Church’s teaching regarding the immorality of artificial means of contraception and sterilization.
2. As equal shareholders who together own a controlling interest in Korte & Luitjo-han Contractors, Inc., we wish to conduct the business ... in a manner that does not violate our religious faith and values.
3. Accordingly, we and Korte & Luitjo-han Contractors, Inc. cannot arrange for, pay for, provide, facilitate, or otherwise support employee health plan coverage for contraceptives, sterilization, abortion, abortion-inducing drugs, or related education and counseling, except in the limited circumstances where a physician certifies that certain sterilization procedures or drugs commonly used as contraceptives are being prescribed with the intent to treat certain medical conditions, not with the intent to prevent or terminate pregnancy, without violating our religious beliefs.

. The Grote Family includes individual plaintiffs William D. Grote, III; William Dominic Grote, IV; Walter F. Grote, Jr.; Michael R. Grote; W. Frederick Grote, III; and John R. Grote. Together with other family members not named as plaintiffs, they fully own Grote Industries, Inc., which in turn is the managing member of Grote Industries, LLC, the manufacturing firm. For ease of reference, we refer to the two companies as "Grote Industries.” William D. Grote, III is Chairman and CEO; William Dominic Grote, IV is President and Chief Operating Officer; Walter F. Grote, Jr. is a board member; Michael R. Grote is the Assistant Treasurer; W. Fred *664 erick Grote, III is the Secretary; and John R. Grote is the Assistant Secretary.

. Just before oral argument, the government . filed a "Notice of Supplemental Briefing on Jurisdictional Issues,” drawing our attention to a brief it filed in response to a jurisdictional order from the Tenth Circuit in Hobby Lobby. The plaintiffs moved to strike this "notice.” Although the government's approach is unorthodox, we have reviewed its supplemental brief in the Tenth Circuit case. In it the government argued that the corporate plaintiffs in Hobby Lobby have standing but the owners of the corporations do not. Supplemental Brief for Appellees at 3-9, Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114 (10th Cir.2013), 2013 WL 1790515 at *3-9. The government also took the position that the Anti-Injunction Act does not apply. Id. at 12-15, 2013 WL 1790515 at *12-15. The Tenth Circuit, sitting en banc, unanimously held that the corporations have standing and that the Anti-Injunction Act does not apply; four members of the court also concluded that the individual plaintiffs have standing. See Hobby Lobby, 723 F.3d at 1121, 1126 (Tymkovich, J.); id. at 1154-56 (Gorsuch, J., concurring); id. at 1184—89 (Matheson, J., concurring in part and dissenting in part). We have conducted our own jurisdictional analysis and find no jurisdictional impediments to reaching the merits. Accordingly, the government’s "Notice of *667 Supplemental Briefing” is inconsequential, and we deny the plaintiffs' motion to strike.

. We note that ‘‘[w]here at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not.” Ezell v. City of Chicago, 651 F.3d 684, 696 n. 7 (7th Cir.2011) (citing Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).

. Whether the corporate plaintiffs are "persons” with religious-exercise rights within the meaning of RFRA is a merits question, not a jurisdictional question. See Chafin v. Chafin, — U.S. -, 133 S.Ct. 1017, 1024, 185 L.Ed.2d 1 (2013); Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 102-03, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); Minn-Chem, Inc. v. Agrium Inc., 683 F.3d 845, 852-53 (7th Cir.2012) (en banc).

. The Anti-Injunction Act is generally assumed to be a jurisdictional bar. See Enochs v. Williams Packing & Navigation Co., 370 U.S. 1, 6-8, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962). That may be incorrect. See Hobby Lobby, 723 F.3d at 1157-59 (Gorsuch, J., concurring).

. The First Amendment provides, in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof....” U.S. Const, amend. I.

. Congress's findings and purposes in enacting RFRA are as follows:
*672 (a) Findings
The Congress finds that—
(1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;
(2) laws "neutral” toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;
(3) governments should not substantially burden religious exercise without compelling justification;
(4) in Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)[,] the Supreme Court virtually ' eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; —
(b) Purposes
The purposes of this chapter are—
(1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)[,] and Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct 1526, 32 L.Ed.2d 15 (1972)[,] and to guarantee its application in all cases where free exercise of religion is substantially burdened; and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.
42 U.S.C. § 2000bb.

. In City of Boerne v. Flores, 521 U.S. 507, 532-36, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court held that as applied to the States, RFRA exceeded Congress’s legislative authority under § 5 of the Fourteenth Amendment. This did not call into question Congress’s authority to "determine how the national government will conduct its own affairs,” O’Bryan v. Bureau of Prisons, 349 F.3d 399, 401 (7th Cir.2003), so RFRA remains in full force against the federal government, see Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal, 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006); see also O'Bryan, 349 F.3d at 401.

. The Dictionary Act is notable for its breadth. It contains general definitions and rules of construction that apply across the United States Code, prospectively and retrospectively unless otherwise indicated. See Nicholas Quinn Rosenkranz, Federal Rules of Statutory Interpretation, 115 Harv. L.Rev. 2085, 2110 (2002).

. For the rules of associational standing, see United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996); Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); and Ezell v. City of Chicago, 651 F.3d 684, 696 (7th Cir.2011).

. See also Thomas C. Berg, The Voluntary Principle and Church Autonomy, Then and Now, 2004 BYU L. Rev. 1593 (2004); Gerard V. Bradley, Church Autonomy in the Constitutional Order: The End of Church and State?, 49 La. L.Rev. 1057 (1989); Kathleen A. Brady, Religious Organizations and Free Exercise: The Surprising Lessons of Smith, 2004 BYU L. Rev 1633 (2004); Richard W. Garnett, Do Churches Matter? Towards an Institutional Understanding of the Religion Clauses, 53 Vill. L.Rev. 273 (2008); Christopher C. Lund, In Defense of the Ministerial Exception, 90 N.C. L. Rev. 1 (2011); Howard M. Wasserman, Prescriptive lurisdiction, Adjudicative Jurisdiction, and the Ministerial Exemption, 160 U. Pa. L.Rev. PENNumbra 289 (2012).

. We deal here with two corporations that are both closely held and managed by the families that own them. As we have explained, the Kortes and Gjrotes as controlling shareholders and directors set all company policy and personally direct the activities of their corporations; as such, they are in a position to operate their businesses in a manner that conforms to their religious commitments. The same normally will not be the case when it comes to large publicly traded corporations, two hallmarks of which are the separation of ownership from control and multimember boards of directors. See 1A William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 70.10 (2006 rev.).

. The Catholic Church’s teaching on the sanctity of human life and the moral wrongfulness of contraception, abortion-inducing drugs, and sterilization is well documented, as is its doctrine of moral complicity and the requirements of Christian witness. See Pope John Paul II, Evangelium Vitae [The Gospel of Life] ¶¶ 58-62 (1995), available at http://www. Vatican. va/holy_father/john_paul_ii/ encyclicals/documents/hf_jp-ii_enc_ 25031995_evangeliumvitae_en.html; Catechism of the Catholic Church ¶¶ 2258, 2270-75, 2284-87, 2366, 2370, 2399 (2d ed.1997); Pontifical Council for Justice and Peace, Compendium of the Social Doctrine of the Church ¶¶ 62-64, 66-68, 230-33 (2005), available at www.vatican.va/roman_curia/pontifical_ councils/justpeace/documents/rc_pc_ justpeace_doc_20060526_compendio-dott-soc_en.html.

. At oral argument the government suggested for the first time that granting a preliminary injunction against the contraception mandate might create Establishment Clause concerns. That was far too late in the litigation to raise the argument. The Supreme Court has rejected a facial Establishment Clause challenge to RLUIPA, the parallel— albeit narrower — statutory religious exemption applicable to the States. See Cutter v. Wilkinson, 544 U.S. 709, 720, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) C‘[W]e hold that § 3 of RLUIPA fits within the corridor between the Religion Clauses: On its face,. the Act qualifies as a permissible legislative accommodation of religion that is not barred by the Establishment Clause.”). The government has not advanced an argument that applying EFRA in this context violates the Establishment Clause.

. In contrast, in Lee the Social Security exemption for self-employed religious persons was extremely narrow. See United States v. Lee, 455 U.S. 252, 255-56, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982).